I call the case of the Pennsylvania Federation of Sportsmen's Clubs v. Gail Norton, Secretary of the United States Department of the Interior, et al. Mr. Wiest May it please the Court, my name is Kurt Wiest and I represent the Pennsylvania Federation of Sportsmen's Clubs and four other organizations. I would like to reserve 30 minutes for rebuttal. That request will be granted. The Federal Surface Mining Control and Reclamation Act requires that the regulations adopted under it be, quote, written in plain, understandable language. And the regulation that is at the heart of this case satisfies that standard. The regulation governs what are known as alternative bonding systems, which are risk pool mechanisms for providing the mine reclamation guarantees that are required by SMCRA. The regulation is codified at 30 CFR section 800.11E1. I'm going to refer to it today as just the ABS regulation, ABS being short for alternative bonding systems. It provides that OSM may approve, OSM is the Federal Office of Surface Mining. OSM may approve as part of a state or federal program an alternative bonding system if it will achieve the following objectives and purposes of the bonding program. One, the alternative must assure that the regulatory authority here at Pennsylvania DEP will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time. That regulation is controlling in this case. It applies because since July 1982, Pennsylvania has had an OSM approved alternative bonding system. It is dispositive because it's plain, understandable language directly addresses and resolves each aspect of the question presented today. Mr. Wiese, I guess I'm a little bit confused as to exactly what it is that you want to remain in place. Clearly, as of 2002-2003, Pennsylvania DEP discontinued the alternative bonding system as it was used per se. The fund remains, but the system is no longer used. Conventional bonds are required. The system is no longer used prospectively. But the fundamental issue in this case, then, is what are the responsibilities for the guarantees that happen for the bonding? I understand that, I guess, but my question comes to the point is I'm having some difficulty understanding what it is you would want OSM to continue to do in supervising the surface mining program in Pennsylvania in light of the DEP's commitment to change in 2002 and 2003. What we'd like OSM to do is to leave in place the 1991 actions that require the alternative bonding system to be solvent, that is, to take care... What would that explain to me? Okay, that's your point. Explain to me what that would accomplish. What that would accomplish is it would provide treatment for mine discharges that are today not treated on sites that, in some instances, were forfeited in the mid-1980s that haven't had treatment. So there would be treatment today where there is no treatment, and there would be a guarantee, and that's exactly what Smigrub demands. Every site, no site left behind. Who would provide that treatment that you've said is not being treated today? The state would contract probably for that treatment. The alternative bonding system, as it does at other sites, uses the money from the bond pool, from the statewide bond pool fund, to provide for reclamation. Indeed, the obligation is to provide enough money to complete the reclamation plan. But isn't it under the enhanced program that was part of the June 2003 approval? Didn't the state, under that enhanced program, commit to do that? No. What they committed to doing was what I would call a triage process. What they've done is taken all of the mines that were covered by the alternative bonding system, lumped them together with all of the mine discharges in the state, and are now doing a sort of triage process to decide which ones to address and which ones not to address. It is what you do when you don't have a guarantee. What Smigrub demands is that you have a guarantee. So are you saying that you cannot terminate an ABS system unless you can demonstrate that the ABS system will be solvent for any future forfeited or continuing forfeited mining operations? Yes. I mean, that's the standard. The ABS has to take care of all of the mines that were bonded, that obtained reclamation guarantees through the ABS. Now, by switching to a different system prospectively, you may limit the number of those that continue to be added to sort of the debt burden on the ABS. But that is the standard that they would have to satisfy. Also, procedurally, they would have to do that through a formal program amendment. The ABS, and this is a fundamental dispute in this case, the ABS has not been terminated. They stopped using it prospectively, but there's… Well, they say they've terminated it. And you are, in fact, saying they can't have terminated it because it was declared insolvent and it hasn't been rendered solvent. I would say that they haven't terminated it. They can't do it because of that reason, the substantive reason. But they also have not procedurally terminated it because the ABS or any of its components can only be eliminated or indeed changed, increased, through a formal program amendment. The only significant change that has happened to the ABS since 1982, since it was originally approved, was the doubling of the reclamation fee in 1993 through a formal program amendment. OSM has proposed a program amendment in September 2006 that would, if finalized, discontinue the collection of the reclamation fee. But that has not gone through. Plus, we're dealing here with a case… OSM or DEP? Well, it's both. Both procedures are, unlike the time that you're probably familiar with, both procedures are going along in parallel tracks now, Your Honor. So the state has also not finalized its rule to discontinue. OSM has not finalized its program amendment. But, again, that's a 2006 proposal. It hasn't gone through. We're dealing here with 2003 decisions that have to be evaluated on the administrative record as of 2003. Mr. Wiest, isn't your… and I know that you have a case pending against the Secretary of… against the Department of Environmental Protection, and it's been stayed pending the outcome of this case. But isn't your dispute on this issue really with DEP as opposed to OSM? I think our dispute is with both of them. Because OSM is ultimately the person who is… or the entity that is supposed to ensure that the federal reclamation standards be satisfied. But I guess my point is in asking the question, as I did, is if you could establish in your suit, which is pending, I think, in the Middle District, just as this one was, against DEP. Isn't there a suit pending in the Middle District? Yes. If you could establish in that case that, in fact, acid mine drainage continues under the sum of the acreage, which was bonded under the ABS, that proper treatment isn't taking place, reclamation isn't being done. If you could establish that before the court, couldn't you then take that information, as opposed to these being allegations that it's not being done, to OSM to say, see, here's what happened. And there isn't sufficient oversight, and OSM needs to be back in here. No, Your Honor, I think that case is staying because of the idea that the issues wouldn't be resolved in this proceeding. And let's be clear, it's not a matter of allegations. There is no dispute that there are untreated disruptors on ABS bondholders. That's in the record. Okay, I understand. What they're saying is that their responsibility with respect to… the ABS's responsibility with respect to those sites. Let's say you have a collection of mines that was forfeited in 1989. From the time of bond forfeiture through August 4th, 2001, when they began the transition, the alternative bonding system had the responsibility under 800.11E1, the ABS regulation, to provide for the full reclamation of those mines. But as of that date, because they made that transition, the obligation of the ABS is limited to the amount of money it then, or now, has on hand. And that's sort of like saying that if you cancel a credit card, your outstanding balance automatically drops to the amount of money you have on hand. It's a heck of a trick if you can get away with it. What they're doing is trying to use a prospective change made through a technical guidance document, an internal document, and saying that it has retroactive effects on obligations that already accrued or guarantees that were already made lawfully under the ABS while the ABS was actively being used. Liability under the bond, under SMICRA, accrues at the time of forfeiture. That's when the obligor has the obligation to fulfill the guarantee. What would an order look like that would resolve this case in the way you want it resolved? Who would be on the receiving end of the injunction and what would it say? I think because this is an administrative procedure and record review proceeding, what would happen is the district court's decision would be reversed. The agency's 2003 actions that undid their 1991 actions that required solvency, those 2003 actions would be set aside as contrary to law, contrary to the ABS regulation. And the 1991 actions would then again come to life and their requirement that the state make the ABS solvent would again be in place. All we're asking is that the ABS take care of the mines that were bonded under the ABS and that neither could change to the conventional system because they were forfeited before 2001 or haven't made the change. I'm sorry, Judge Roth. Is there a way they could ever make the shift to the conventional bonding system that would satisfy you folks? The shift itself to the conventional bonding system isn't a problem in the sense that the mines that successfully made that transition are not going to be burdened on the ABS. What they haven't done is they haven't taken care of the part of the problem left behind by the ABS that can't be taken care of by the transition. Well, we've grown up this plan. Look, we're going to take care. We know where the areas are and as we are able to do it, we're going to take care of them. Isn't that sufficient? No. SMICRA demands a guarantee. Every mine that is permitted under SMICRA is supposed to be fully reclaimed. That's why it required a bond. That's why it required a guarantee. But if the state says it's going to do it, isn't it going to do it? No. I mean, they haven't done it already. You have districts out there that have been untreated for 20 years. Mr. Cain, would you put an additional five minutes on the clock?  The plan that they have is not a guarantee. If they wrote up a plan, a work plan, that said, here's the guarantee that all of the mines that were bonded under the ABS will be fully reclaimed in the future, we would not be here today. The fact is, what they have is not a guarantee. If they had a guarantee, that would be satisfactory. That's what we're asking for. That's what OSM demanded in its 1991 action. Solvency of the ABS is a guarantee. Anything less than that does not satisfy SMICRA's requirement that all mines have a solid guarantee of reclamation. But hasn't DEP said, and OSM agreed, that the 8- or 10-point plan, which included remining and reclamation in lieu of litigation, and separate appropriations to the ABS fund, hasn't DEP said, and OSM agreed, that that enhanced program, based on the best projections available in 2003, that that was sufficient? They did say that that was sufficient, and that's incorrect. Okay, you disagree with that conclusion. Yes, because there isn't a guarantee, and because they are doing triage. They are going to leave some of these sites behind. Whatever they say to the contrary, they are now making that judgment. I know that because of documents I've gotten in FOIA. But they have to make that judgment. And if that document said, every ABS mine will be treated, and here's the schedule, here's the guarantee, the fact that some of these discharges have been out there for almost 20 years, and certainly a good number, more than a decade, without any kind of treatment. A work plan is what you do, and that long work plan is what you do when you don't have a guarantee. And that long tail imposes burdens on the public that SMICRA was supposed to prevent. That's why you want a guarantee, and that's why you have to do something like West Virginia has done. West Virginia proposed to stay with the ABS system. That's right. They did. Well, with both, isn't it? Pardon me? West Virginia has both instituted a CBS and continued its ABS. No. West Virginia has a purely alternative body system at this point. Pennsylvania, only Pennsylvania has the conventional and alternative bonding system. But that point is irrelevant with respect to the ABS's obligations towards the sites that were bonded and then forfeited under the ABS, because the liability of the ABS, the obligation to perform, accrued at the time of forfeiture. And what they're saying is that an obligation that accrued, let's say, in 1989, and an ABS mine that had its bonds forfeited, is now limited or expunged, but certainly limited, by a change made 12 years later about the bonding mechanisms that different mines can use. There's simply no theory under the law that you can expunge those kinds of accrued liabilities based on an internal technical guidance document that is purely prospective. What's the theory that you think your opponents have put forward in that regard? Are they here with a theory to address that? When you say there's no theory under the law, what's your take on what they're saying? Their theory is that the standard of Section 800.11E1, the ABS regulation, that that whole regulation simply does not apply after August 4th, 2001. And why they're wrong about that is that the ABS remains a fully approved part of the Pennsylvania State Program. And under 30 CFR, Section 733.11, a state with an approved state program must implement, administer, enforce, and maintain that program in accordance with SMCRA and in accordance with OSM's Title 30 regulations, which include the ABS regulation. So bottom line, as long as an ABS is part of an approved state program, it must satisfy the standards of the ABS regulation, 800.11E1. I'm surprised in your complaint that you did not seek an injunction to demand a program amendment to eliminate the ABS. We did object to the manner in which this program enhancement was processed without a program amendment. But now they have started that process. But until the ABS is eliminated through that process, the standard that I just mentioned, 733.11, means that the ABS regulation continues to apply. The ABS must satisfy that standard. And if they minimize the burden on the ABS going forward with the conventional system, all the better. But that doesn't mean that the obligations that accrued against the ABS aren't that good. Mr. Wiest, we'll have you back on the phone. Let me ask one more quick question. You say the process that they have now initiated, the regulatory process, will that result in, if your view of the statute and the regs are followed, in a determination that, in fact, they cannot amend the program by eliminating the ABS? It should. Again, we presented the same comments. We've literally presented the briefs that we submitted in this case to the agency. We've also encouraged both agencies, both the state government, the Environmental Quality Board, and OSM, to withhold action on that program amendment pending this court's decision in this case about what the scope of the obligations are toward the mines that were bonded under the ABS. But on the flip side, should we hold off and let the regulatory agency determine whether the plan can be amended before we try to jump in? No, I don't believe so, Your Honor, because I think the question presented is going to be the same either way. The question is going to be, under the ABS regulation, what are the obligations toward the mines that were bonded under the ABS and that have not made or could not make the transition to conventional bonding? And our position, of course, is that the ABS remains responsible to take care of all of those mines because there has to be a guarantee. Thank you. We'll have you back on rebuttal, Mr. Weiss. Ms. Rountree? May it please the Court, good morning, Your Honors. Tamara Rountree representing the Interior Department. And if you need additional time, we'll provide you some additional time. Thank you very much. Can you hear me well? I'm echoing in my ear. We can hear you. Okay. And I will be sharing my time with Counsel for the Commonwealth. I would first just like to address the statement that Judge Fischer made, and I'd like to project a reason as to why in the appellant's complaint there's no injunction for a program amendment for the termination of the ABS, and that's because this issue was not raised in the district court. The question of whether a program amendment for the termination of an ABS was not put before the district court, the parties did not brief it, the district court did not address it, nor did it rule on it. And we've addressed that fact in the government's brief. But they did allege it in one of their paragraphs in the pleading that it was. Only in the opening brief on appeal. That's the first time the issue has been raised. If the court would like to expand upon that, I actually would request that either we have supplemental briefing. No, I think that you both covered it. Okay. Now, the resolution of this case actually just requires that the court address two straightforward questions. The first is whether in 2003, the date on which OSM issued the decisions that are being challenged in this case, Pennsylvania had an operating and functional ABS system in place. Three undisputed facts in this case confirm that the answer is no. Now, first, in 2003, any entity that wanted to establish a new surface mining operation was not allowed to post an ABS bond. It is undisputed that for all new mining operations, they could only post a CBS bond, a conventional bonding system bond. Second, for existing mining operations that had been originally permanent under the ABS system, they didn't have the option of, for example, having their ABS bonds grandfathered. They were not allowed to keep the ABS bonds. It is undisputed that for all of these types of sites and operations, they were required to convert to a CBS bond. And third, the Commonwealth of Pennsylvania itself was not of the view that it had an operating ABS system in place. It's not disputed in this case that Pennsylvania had actually implemented a policy under which it ended its ABS program and converted to a CBS program. Let me ask a question, if I may, and apologize if this is simplistic. But answer, if you would, the point made by Mr. Weiss, that this is roughly equivalent to a credit card holder saying, okay, I'm changing over now, so all I owe is the money I have on hand, even though I may owe vastly more than that. By shifting over to some new regimen, I can ignore, and you can't get at me for however much more I may owe. That that's functionally what's going on here, and that that's fundamentally at odds with the Act and the regulations. Two points. First, nothing in the federal regulations address how a state may go about terminating an existing system and converting over to another. Second, Pennsylvania's existing state regulatory regime and its state-approved program allowed for the Commonwealth to have either an ABS or a CBS. So the fact that it simply converted from one form to another to address all of the reclamation problems that existed in the Commonwealth was something that it could under... Isn't that the very point, Ms. Ramsey, that's being contested here, that in making this switch, it's not addressing it? I mean, that's the point that's being pressed on us, is that, look, if you let them make this switch in the manner they say they're making it, they are effectively undermining the Act, the Act which says you've got to clean up your mess. You're letting them walk away from that court if you don't make them clean up their mess. What the Act says, what the federal regulations say is while you have an existing proposed ABS or one that's actually existing, you've got to maintain insolvency. So that you can stop it at any time and say, well, I don't have to worry about insolvency anymore? Nothing prohibits the Commonwealth in this instance from converting. Ignoring the insolvency? The end of the sentence. The Commonwealth of Pennsylvania has been put on notice of the insolvency. Having been put on notice of that, can they simply change the system and let the insolvency disappear? They can change the system. And then what happens to the insolvency? And what the Commonwealth has done here, as Judge Fischer has addressed, has an entire plan in the enhancement document for addressing each and every of the concerns that exist regarding reclamation. Those words haven't been used, but I get the feeling they consider it smoke and mirrors. I'm sorry? I think the plaintiffs consider that that new plan is smoke and mirrors. There's no guarantee. It sounds nice, but are they going to do it or aren't they going to do it? They don't have to do it if they don't want to, do they? The party is more than welcome to say that the Commonwealth has gone through years of planning and working with OSN and with its permittees to actually just generate something that it will not follow through with. In the terms of the plan, do they have to follow through with it? Is there citizen enforcement, for instance, that's available? I cannot speak to that. I don't know if there's citizen enforcement. However, the fact is, and appellants have, you might want to address this, there is nowhere that prevents the Commonwealth from doing what it has done. If the state legislature, if someone feels there should be a slush fund for those sites that are forfeited and cannot be addressed, or an emergency fund, I'm sorry? I don't think slush fund is the appropriate term. An emergency fund to address, for example, sites that are forfeited and there's not sufficient money, then perhaps the state legislature should take that up. But until that's done, Pennsylvania has put in place a system that it says it will implement. Let me take you back to the fundamentals, if I can, for just a second. Would you agree with the plaintiffs that under SMCRA and the regs, that under an ABS system, the purpose of the ABS system was to ensure that each site, as your opponent put it, that there's no site left behind. Every site has to be cleaned up. That's their assertion, that that's not only the purpose, but the actual legal effect of the statute and the regs. Do you agree or disagree with that assertion? As long as there is a proposed ABS or existing ABS, indeed. However, the federal regulation and the frame... Stick with me for a second. If that is indeed what the ABS requires, that system requires, and that's what's required by the act, how can it be consistent with the act to allow a state to take a step which, I think I hear you admitting, does not provide the same obligation to the state to clean up every site? If I've misunderstood you, please correct me. But I think I've heard you say the state has a plan, created in good faith, to address these problems. But it doesn't have to do it as it would have had to do it under the ABS system that was previously in place. That's correct. Because there was no ABS in place, the Commonwealth is not bound by 800.11E1. And the reason is, if you look at the language, and I refer you to page 8 of the government's brief, which is where the regulatory language is, the sentence states that... And the point I'm about to make is the appellants have taken the phrase at any time, the regulatory phrase, and applied it to the first clause of the sentence. And in doing so, it then is able to argue that the provision has no bounds in terms of time. It applies out into infinity. Because under the appellant's interpretation, you have to read the provision as stating, at any time, the alternative bonding system must assure that the regulatory authority has available sufficient money. That is not how the provision reads. Let's ask Ms. Ruiz that when he gets back. I've read the provision. Seems to me that's how it reads. No, the phrase at any time is at the end. The sentence has a time frame for the beginning, which says the alternative bonding system, or the alternative, which is what it refers to. That's in the present. It's referring to the alternative bonding system. It doesn't say whether there is an alternative bonding system or not, there must be sufficient money. Okay, but you said there is no termination provision in the statute or in the regulation. Nothing dictates. Therefore, should we not consider the existing regulations and their impact in determining what needs to be done if you are going to terminate an ABS? No, it doesn't seem that a provision that applies to an existing system can't have application when there is no longer system. But before you let the existing system terminate, shouldn't you review what the regulations say to understand, even though there is no specific provision for termination, how termination can take place if there are regulations which speak about ongoing responsibilities? Ms. Rondry, we just gave you an additional five minutes. Thank you. I don't see how it is that a provision that doesn't speak to the question the court is looking to address can dictate. Well, the provision talks about the need for ongoing accountability, the way I read it. And one must ask, what is that time frame? For what time frame is there ongoing liability? And it's our position that it doesn't go into affinity. It's appellant's that it has no bounds. This provision never ends. Okay, it goes as long as there is an ABS. Correct. But can you terminate the ABS unless you can make the determination that there will be a provision for that ongoing responsibility that it has been covered in one way or the other? Yes. As you can't terminate your credit card unless you can ensure that you will be able to make provision to pay off, to cover any amounts due and owing, that you cannot terminate your ABS, which is required to have an ongoing responsibility, unless you can demonstrate that you are prepared to fulfill that ongoing responsibility. Turning to the credit card analogy, if there were no requirement that one had to pay outstanding balances, why would one have to pay them? Okay. There is no provision that says once an ABS is terminated that... No, but if you are going to determine, if you are going to terminate it, don't you have to, since there is nothing to tell you how to do it... That's the point. There's nothing to tell you how to do it. But there is something that tells you what you've got to do as long... There is something that tells you what you've got to do as long as it is ongoing. And can you stop it being ongoing unless you can fulfill the responsibility that you have while it is ongoing? While that may be a question, and my point is simply there is nothing for the court or the agency to turn to in terms of guidance as to how one may terminate an ABS. No, but there is something that tells you what you've got to do while it's ongoing. I simply don't know... And can you stop doing it unless you can demonstrate that in stopping it you will be able to fulfill the responsibility that you undertook in creating it in the first place? Because there is no guidance here, OSM looked to what it was that... Okay, but how about if we say we do see guidance? We see guidance in 811E1 that there is an ongoing responsibility and you can't terminate that ongoing responsibility unless you can demonstrate that you have provided for the means to fulfill that ongoing responsibility. If you see that language in that sentence, then perhaps it would be required. It's OSM's position that that language is not there. And what it was faced with was the question of whether there was an ABS in place in 2003 against which, for example, OSM could issue an order to Pennsylvania and say, do this to your ABS. Quite clearly, Pennsylvania would say, well, but we don't have one. And OSM said the same thing, you don't have one. And Pennsylvania, for example, couldn't go to its permittees and say, we want you to take this action under your ABS. There was no ABS. Ms. Farntree, isn't a real question here. First of all, isn't this the first conversion from an ABS to a CBS by any state? Yes, Your Honor. Since 1980? That's correct. Okay. And isn't the real question here as to whether or not when you do convert, and Pennsylvania being the first to convert, that OSM is to keep supervision over the solvency of that remaining ABS obligation or whether or not you can accept a proposal from a state that says, here's how we're going to resolve the remaining solvency problems, and you can discontinue 732 supervision. Isn't that really the question here? I'm sorry, I'm not sure. Maybe not 732, 811E supervision. Well, the 733.11 supervision. Yes. Are you saying is the question whether OSM continues its oversight authority once the conversion has taken place? Yes, and that's the question. Indeed, and there are regulations. Okay. In other words, Pennsylvania has said no more ABS. We have a residue of reclamation and acid mine treatment that has to take place in our state. Which we're going to address, yes. We're creating a fund to address that, and we're proposing other mechanisms that will address that. Indeed. The question is at that point, does OSM continue direct supervision over that under 811E1, or do you say? OSM is now, its oversight authority over Pennsylvania is under 800.11A through D, which governs CBS programs. But you're only governed prospectively under A through D. Absolutely. My point is, and I think you're missing the point that both Judge Roth and I'm trying to get to, and what the Federation is arguing, is you have this ABS obligation that's clearly on the books, and you have ABS debt that's strewn all across the landscape in Pennsylvania that someone needs to eventually address. And the question is, while that's being addressed under this remaining ABS fund, should OSM keep supervision over that activity, or should you sign off, as you have done, and said, unless someone complains to us about what you've done, you continue to have primacy, and we're not going to interfere on a day-to-day basis? Isn't that the question? First of all, it's OSM's understanding that the fund is not an ABS fund, because it's OSM's position that there is not an ABS fund. Well, it has to be an ABS fund. Call it what you will. There's money that's available. To clarify, it's a surface mine reclamation fund. Correct, correct. That's what it's called in Pennsylvania. Money that's available that was once associated with a now discontinued fund. But more importantly, I'd just like to make this very clear, the question before OSM and the decision rendered was not coming from Pennsylvania asking OSM, may we convert? It was OSM's position that they could convert. Under their existing scheme, there was no change to law, regulation, or their state program requiring approval to change systems. They did that. Having done that, they then came to OSM and said, about this 732 notice in your codified amendment at 938.16h, this is what we've done to address it. OSM then looked at that, and the question they were then faced with was what their regulatory status was. But isn't the remaining question, and I know you want to focus on the CBS fund going forward. That's fine. I'm sorry. No one's disputing that Pennsylvania's CBS fund going forward is properly supervised, at least not for this appeal. The remaining question is, who reviews the remaining liabilities to the Commonwealth of Pennsylvania and to the federal government of the unreclaimed land that was mined under the old ABS program? And the question is, does 800.11e1 continue to govern the supervision of that remaining liability? I think that's the issue here. No. There's no provision. There's no requirement under federal relations that has the OSM monitoring something that doesn't exist. And in its view, there is no program. That's your point. Absolutely. Even though this is the first time it's been done, no other state has proposed that you're liable to have subsequent proposals in West Virginia and elsewhere, Missouri. Again, I don't see how the agency can issue an order or make any request of a program that the Commonwealth itself is saying doesn't exist. Isn't that really a matter of, you know, if we say it doesn't exist, it's your view that then OSM's responsibility ends? Nothing indicates that it does. Nothing indicates that there is an operating functional ABS system in place that's being enforced. Should it exist? Separate question. Should it exist? Separate question not posed to the agency, not posed to OSM. That's not what it addressed here. And I understand your concern. I'm not trying to dismiss your concern. I'm simply saying that was not the question. Let me ask a question if I can, if you wouldn't mind. Am I to understand the position of the federal government to be that a state can come into the agency responsible for supervision and say, you know what, we changed our mind. We're just not doing that anymore. We're done with that. That the OSM has no obligation or power to do anything at that point. Because you may not be using those words, but that's what I hear you telling me, that if any state comes in and says, we're just not doing that anymore. Your responsibility as a federal agency governing that program comes to a conclusion because the state's assertion that it's done means it's done. Have I heard you right? No. Under your hypothetical, as I understand it, you're asking whether, for example, a state can simply walk in the door and say we've dropped the ball, we're not doing anything else. No matter what they say. If their system, whatever program had been approved by the federal government, was still in place, clearly the government would say you were still obligated to meet the requirements. Please stop. Hold on a second because you're putting the rabbit back in the hat. So I'm not getting an answer to my question. You said if it's still in place. But the assertion you're making here emphatically is OSM could do nothing because the ABS was over. I've heard you say that repeatedly. Okay, I'm sorry. So you don't have to say that to me all the time. Your hypothetical is that the state that came in said we don't have a system in place. My hypothetical is the state comes in and for whatever reason, any reason, no reason, anything at all, just says we stopped. We're not doing that anymore. We're going with another system. Well, clearly the answer is no. So what is it that in this circumstance makes you say so earnestly we can't do anything because there's no program? If what the plaintiff is saying and what I understand them to be saying is you, the court, have to go back, you've got to make them start again because what they've done is to nullify an ongoing obligation and OSM can't let them do that. Why is this circumstance different from the hypothetical I propose? In part because of what I've said several times and I won't say again, but also in part because the state You mean because there's no ABS. Yes. The state, though, the Commonwealth in this instance didn't have to get, it was OSM's view that the Commonwealth did not have to get approval. In your hypothetical, I believe that the state would have to come in and say, You know what? You know that state program that you approved that said we could have only an ABS? Well, now we'd like to change. We'd like to change it to a CBS. If in that instance the state had no authority to have any other type of system, OSM would say, Sorry, you can't do it. Your state program says you can have only one kind of bonding system. It's an ABS. You have got to fulfill the requirements of that system. You cannot change. Or if you want to change, it would have to be a program amendment and we've got to go through the formalities. Here the case was different. Pennsylvania, again, was not coming to OSM for approval to make the conversion. It was able to do so under its existing statutory regulatory scheme. So the fact that it said, Yes, we want to change. If you want to say it's dropping the ball, then you look at the enhancements document and see if it's really dropping the ball. But they were able to make the conversion. OSM simply had to look at what took place and what was its responsibility after that change had been made. Thank you, Ms. Frantre. Mr. Whitaker, do you really want to wade into this? Yes, Your Honor. I think I can provide some clarity here perhaps from the Commonwealth's perspective. Good morning. May it please the Court. My name is Dennis Whitaker and I'm here today representing the Commonwealth of Pennsylvania Department of Environmental Protection. And obviously there's a few, based on the questions here that the Court had, there's a few things that need to be addressed. Number one, as Ms. Frantre pointed out and as we point out in our brief, in 1982 when Pennsylvania was granted primacy, Pennsylvania's statute and regulatory scheme allowed for both a CBS and an ABS. And as we point out in our brief, up until 2001, Pennsylvania in fact had a bifurcated program which allowed for some entities, surface mines, coal refuse reprocessing operations, I believe, and others to operate under an ABS while underground mines and coal refuse disposal areas operated under a CBS. There's no doubt here that Pennsylvania had a problem. OSM, the two actions here at issue were OSM's termination of a 1991-732 notice and a 1991 required program amendment which was codified in 30 CFR section 938-16H. Because the ABS was insolvent. Yes, and there's no doubt. There's no dispute about that. It's in the record. Pennsylvania increased double its reclamation fee in 1993 from $50 to $100. However, it soon became clear to us that the doubling of the reclamation fee, in fact, nothing we could do was going to make the ABS solvent largely because there is a decreasing number of surface mining acres being permitted. So no matter how much you raise the fee, eventually there wasn't going to be enough acreage to make it solvent. Therefore, in order to address it, Pennsylvania did a number of things. First of all, for all new and existing mines in operation on August 4, 2001, Pennsylvania switched over to a CBS, the conventional bonding system, or full-cost bonding system. So what that means is that everyone who had a reactive mine site or a new permit after that had to be fully bonded. With regard to the primacy forfeiture discharges or primacy forfeiture sites that occurred prior to the conversion, Pennsylvania proposed to address those through the mechanisms laid out in the discharge abatement work plan. And I think the focus of the court here needs to be, did OSM properly terminate the 732 letter and did OSM properly remove the required program amendment at 30 CFR section 93816H? And the answer to that by the district court was yes, and in our view that's the case also. Let me ask. At that point, at that juncture, not meaning to have you tread on Ms. Roundtree's territory too much, but was OSM empowered at that point to say no to the state? I believe the answer to that would be no, and the reason for that is in 1982 when Pennsylvania's program was approved, the Pennsylvania Surface Mining Act, which is a state analog to SMCRA at 52PS section 1396.4D, allowed for both an alternative, or I think Pennsylvania calls it alternate in their statute, and a full cost system. And as I said, Pennsylvania operated a bifurcated system from 1982 to 2001. So I think the straightforward simple question, and I know where you're going here and let me see if I can anticipate. The straightforward simple question is, did OSM stop Pennsylvania from switching to a CBS? The answer to that was no. The next question is, well, does OSM still have any oversight over the primacy forfeiture sites that were formerly covered by the ABS? In other words, sites that were declared forfeit prior to the conversion in 2001. And my answer to that, and Pennsylvania's answer to that, is yes. And the reason for that is that Pennsylvania submitted to OSM in an effort to address the 732 letter and the 938-16H required program amendment, the program enhancements document, which the district court correctly described as a description of events that had already taken place and some planned future events, and the work plan, the discharge work plan. And I'm out of time. May I finish answering your question? Please do. We may have some other questions. Oh, that's fine. I didn't want to presume. And the discharge abatement work plan. And the discharge abatement work plan says right in there that that is a programmatic commitment of Pennsylvania. OSM terminated the 732 letter and withdrew the required program amendment of 30 CFR section 938-16H on the basis of that submission. So the Commonwealth's view is that OSM retains oversight to make sure that Pennsylvania complies with the conditions of the termination of the 732 letter and the removal of the required program amendment. In other words, OSM comes to Pennsylvania and says, you told us that you were going to do X, Y, and Z, and on that basis we terminated the 732 letter and removed the program amendment. If I'm understanding right, Mr. Quicker, you're saying that as a matter of power, OSM could have said when the 732 letter was in play, that's not good enough. We want a guarantee. We want, to use the plaintiff's language, an equivalent promise to the type you had under the ABS system. And if you give us that, good enough. Otherwise, you can't do it. Now, I'm not asking about whether it was a good idea or a bad idea. I'm just asking about as a matter of power, was OSM in a position to do that? Yes. When the Pennsylvania DEP submitted the program enhancements document and the discharge abatement work plan to OSM, OSM could simply have written back and said, well, this is a good start, or it's horrible, or anything in between. But they didn't. They looked at it and they said, okay, your program already said that you could have a CBS or an ABS, so that's that. Now, with regard to the primacy forfeiture discharges that occurred under the ABS, we'll look at the work plan because OSM's view of the world, and it's our view of the world also, and the district court's view of the world, we believe was the correct one, which is that OSM correctly interpreted or correctly viewed that 811E, which is the ABS portion of the Code of Federal Regulations, no longer applied when Pennsylvania switched to a CBS because Pennsylvania had always had the authority for a CBS. And I don't want to test the court's patience here, but I would like to address one or two items if you don't have any more questions before I sit down. I'm sorry. How about one item? Okay. The credit card analogy. The credit card analogy works if Pennsylvania's a debtor. Pennsylvania's not a debtor here. Pennsylvania is not the guarantor of the ABS. Plaintiffs can point to no statutory or regulatory provision which makes Pennsylvania the guarantor of the ABS. Pennsylvania is not, again, the guarantor of the ABS. Pennsylvania is the administrator of a system which was approved by OSM in 1982. Pennsylvania recognized as an OSM in 1991 that the system wasn't working or was insolvent and has been taking steps or making efforts ever since to fix that. The most recent effort, the most recent steps were the program enhancements document and the discharge abatement work plan. Now, on that basis, OSM agreed that Pennsylvania had adequately addressed the concerns that were expressed in the 1991 732 letter and the required program amendment 93816H and terminated those. And as the district court said, and as your honors well know, the issue here isn't whether it's the preferred method or the method. It's whether it's based on a permissible reading of the law. The district court, in fact, concluded that it was. And based on the record in this matter and what we have on our brief, we would urge the court, this court, to come to the same conclusion as did the district court. Thank you very much, your honors. Thank you, Mr. Whitaker. Mr. Wieston-Rebuttal. Let me make just a couple quick points. The ABS absolutely, indisputably is in place today. Mr. Whitaker just told you it was approved in 1982. What happened to it? OSM hasn't disapproved it, hasn't disapproved any element of it. Today the reclamation fee is collected. It goes into the SMCRA fund, the ABS bond fund, and those funds can only be used and only are used to reclaim sites that were bonded and operated under the ABS. You asked a question about the enforceability of the work plan. The work plan is not enforceable. The only thing that is enforceable by OSM and by citizens, through citizen suits, are program amendments. This so-called, this bureaucratic legalese programmatic commitment. What about the question that Ms. Rountree raised and also raised in their brief, that you did not properly raise the question of the program amendment? We absolutely did. And why did you raise it? The question is not, it was not an issue. It's not a separate issue. It was a response to what I think is a nonsensical position from OSM that the ABS has been terminated. We responded by saying, no, the ABS hasn't been terminated. It is still in place. Page 6 and note 6 of our SIR reply brief in the district court raises that issue. In the administrative record, our comments at pages 160, I'm sorry, 156 to 160, and 220 to 221 and 236 of the appendix, one of those comments is termination and abandonment of the ABS would be unlawful. And it cites on, I believe, on page 221 of the appendix the critical regulations, 30 CFR section 732.17G, which says that you can only change a program through a program amendment, and 733.11, which says that you have to implement your approved state program in accordance with the regulations, including the ABS regulation. Mr. Wheat, would you respond to Mr. Whitaker's attack on your credit card analogy? He said, hey, it just doesn't have place here. The state, there's no basis for talking in those terms because the state's not a debtor, not a guarantor in any fashion. The state general fund is not a guarantor, but what he did say was that as an administrator, it functions as an administrator, but if the administrator of my organization starts disclaiming the liabilities of my organization, yes, he's not a guarantor. He's not on the hook personally, but he can't do that. And here you're talking about a government that has a constitutional obligation under Article I, Section 27 of the Constitution to serve as a trustee of Pennsylvania's public natural resources. If they're serving in that sort of trustee capacity with respect to this fund, they can't just sort of disclaim that liability. But I do agree that he's correct that the state of Pennsylvania, the Commonwealth of Pennsylvania general fund is not on the hook. That doesn't mean that they don't have to change the ABS to cover its debts. Thank you, Ron. Mr. Wheat, I'm not sure that this is what Ms. Rountree was arguing or not, but it seems like it was, that the OSM was not given authority by Congress to continue to monitor the remaining liabilities under an ABS program that was converted to a CBS program if the state provided sufficient basis to allow the conversion to take place. Can you respond to basically my first part of that? Does OSM have the regulatory authority from Congress to monitor these remaining ABS obligations in Pennsylvania? Absolutely. Where? Which part of the statute and which part of the regulations that they've promulgated gives them that authority? Well, I believe that the clearest is Section 733.12a of the regulations. They have an obligation to annually review the approved program against the standards of what are known as the Chapter 7 regulations, which include the ABS regulations. What they could have done in 2003 is say to Pennsylvania, look, you can switch, we can't stop you from switching for the mines going forward prospectively, requiring those new mines to post full cost conventional guarantees. But we're not going to terminate our 1991 actions that require you to make the ABS solvent until you actually demonstrate to us that what you're doing is equivalent to making the ABS solvent, and that's what they didn't do. The question about whether the program enhancements adequately addressed that problem, our position is clearly that OSM was wrong. It doesn't adequately address because it doesn't provide the guarantee it's not equivalent. All right, you answered that question. Thank you, Mr. Weiss. Thank you. And we thank all counsel for an excellent argument on a very important issue, and we'll take the matter under advisement. Let's take a five-minute recess. Okay. Please rise. We'll take a five-minute recess.